IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

\* \* \* \* \* \* \* \*

| | | |
|---|---|---|
| MARION BRYANT, JR., | ) | |
| | ) | Civil No. 2:95-CV-362J |
| Petitioner, | ) | (Consolidated with 2:95cv377W) |
| | ) | |
| vs. | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |

\* \* \* \* \* \* \* \*

On April 19, 1995, petitioner Marion Bryant, Jr., filed his motion pursuant to 28 U.S.C.A. § 2255 (1994 & Supp. 1997), commencing the above-captioned proceeding. On April 21, 1995, the matter was referred to a United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) (1994). The Magistrate Judge ordered the Government to respond to the petitioner's motion by June 15, 1995. In the interim, petitioner filed another memorandum concerning relief under § 2255, which was assigned a new case number (*Marion Bryant, Jr. vs. United States of America*, Civil No. 2:95-CV-0377W), and was consolidated with petitioner's original proceeding by Order dated May 3, 1995. On May 10, 1995, the Government filed its response, accompanied by trial transcripts. On May 18, 1995, petitioner filed a request for an evidentiary hearing, and on May 22, 1995, petitioner filed a reply memorandum, accompanied by exhibits.

On April 23, 1996, nearly a year after completion of briefing of his § 2255 motion, petitioner filed a "Motion to Permit Legal Assistance," asking leave to be represented by another inmate, which was denied by the Magistrate Judge by Order dated September 3, 1997, noting that

"if petitioner needs legal assistance at this time, he could apply for appointment of counsel from this court."  No subsequent application for appointment of counsel has been filed.

On March 27, 1998, the Magistrate Judge issued a Report and Recommendation urging the denial of petitioner's § 2255 motion and his request for an evidentiary hearing.  Mr. Bryant filed "Petitioner's Objections to Magistrate Report and Recommendation" on April 9, 1998 (dkt. no. 16) ("Objections"), and the Court deems the matter submitted for decision.

The Court has reviewed petitioner's motion, memoranda and exhibits and the Government's response, including the trial transcript, with some care, as it has the Magistrate Judge's Report and Recommendation.  In addressing the merits of petitioner's motion, the court remains cognizant of the case law holding that "a *pro se* petition should be construed liberally . . . ." *Collins v. Hesse*, 957 F.2d 746, 748 (10th Cir. 1992); *Chase v. Crisp*, 523 F.2d 595, 597 (10th Cir. 1975)("[A] *pro se* habeas corpus application should be given a liberal construction.") (citing *Miller v. Crouse*, 346 F.2d 301 (10th Cir. 1965), and *McKinney v. Taylor*, 344 F.2d 854 (10th Cir. 1965).  This rule of construction parallels that expressed in *Haines v. Kerner*, 404 U.S. 519, 520 (1972), *viz.*, that "however inartfully pleaded," the allegations of a *pro se* complaint are held "to less stringent standards than formal pleadings drafted by lawyers . . . ." *Accord, Northington v. Jackson*, 973 F.2d 1518, 1520-21 (10th Cir. 1992)("The district court must construe a pro se plaintiff's complaint liberally . . . . *Haines v. Kerner*, . . ." [citation omitted]).

## I

In pertinent part, 28 U.S.C. § 2255 reads:

A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was

without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

As written, § 2255 "clearly provides a statutory means by which an individual under federal sentence can obtain federal habeas corpus review of the sentence imposed." *United States v. Jordan*, 915 F.2d 622, 625 (11th Cir. 1990), *cert. denied*, 499 U.S. 979 (1991). Congress enacted § 2255 "to provide in the sentencing court a remedy exactly commensurate with that which had previously been available by habeas corpus in the court of the district where the prisoner was confined." *Hill v. United States*, 368 U.S. 424, 427 (1962). Pursuant to § 2255, individuals sentenced by a federal court can attack the sentence imposed upon one or more of four different grounds: "(1) that the sentence was imposed in violation of the Constitution or laws of the United States; (2) that the court was without jurisdiction to impose such sentence; (3) that the sentence was in excess of the maximum authorized by law; and (4) that the sentence is otherwise subject to collateral attack." *Hill v. United States*, 368 U.S. at 426-27. However, *Hill* observes that only "fundamental defects" resulting in a "miscarriage of justice" can form the basis for collateral attack. *Id.* at 428. *See* Part II *infra*.

## II

The grounds asserted by petitioner for his §2255 motion are as follows: (1) petitioner received ineffective assistance of counsel at every critical stage of the proceeding, including pretrial, trial, sentencing, and appeal; (2) the Government's prosecution of petitioner was selective and motivated by race, and that the trial court erred in denying petitioner discovery and an evidentiary hearing on the selective prosecution issue; (3) the Government engaged in outrageous

conduct and prosecutorial misconduct; (4) the trial court erred in denying petitioner the opportunity to cross-examine an investigating officer concerning the referral of petitioner for federal prosecution; (5) petitioner was denied a fair and impartial trial because of "unknowing" bias on the part of the trial judge; and (6) the sentencing court erred in applying a four-level upward adjustment under § 3B1.1(a) of the federal sentencing guidelines for petitioner's role as leader or organizer of the offense.

In his objections to the Report and Recommendation, Mr. Bryant does not assert that he was not vulnerable to prosecution for his offenses of conviction; nor does he genuinely dispute the evidence of his guilt. Rather, he argues that he should not have been singled out for prosecution in federal court. Thus, at the outset, Mr. Bryant's motion and his exhibits do not seek to demonstrate that "a constitutional violation has resulted in the conviction of one who is actually innocent." *Schlup v. Delo*, 513 U.S. 298, 321 (1995). Instead, Mr. Bryant challenges the integrity of the Government's original charging decision--the decision by the United States Attorney to seek a federal grand jury indictment and to proceed against Mr. Bryant in federal court. "A selective prosecution claim is not a defense on the merits to a criminal charge itself, but an independent assertion that the prosecutor has brought the charge for reasons forbidden by the Constitution." *United States v. Armstrong*, 517 U.S. 456, 463 (1996).

- 4 -

## III

In his motion, Mr. Bryant also asserts he was denied effective assistance of counsel.[1]  The

Supreme Court has crafted a two-prong test for determining a claim of ineffective assistance of

counsel.  In *Strickland v. Washington*, 466 U.S. 668, 687 (1984), the Court ruled that a habeas

petitioner must show that his or her attorney's performance was deficient and that the deficient

performance prejudiced his or her defense.  Prejudice is established if "there is a reasonable

probability that, but for counsel's unprofessional errors, the result of the proceeding would have

been different."  *Id.* at 694.  In order to label counsel's assistance at trial as ineffective, the court

must conclude that "counsel's conduct so undermined the proper functioning of the adversarial

process that the trial cannot be relied on as having produced a just result."  *Strickland*, 466 U.S. at

686.

## IV

To prevail on his claim of selective prosecution, Mr. Bryant "must demonstrate that the

federal prosecutorial policy 'had a discriminatory effect and that it was motivated by a

discriminatory purpose.'"  *United States v. Armstrong*, 517 U.S. 456, 465 (1996) (quoting *Wayte v.

United States*, 470 U.S. 598, 608 (1985)).  Mr. Bryant alleges that

> [a]pproximately 150 people have been charged as a result of the same operation
> that accused Bryant (Movant).  Only ten of those have been referred to federal
> court. All ten are African[-]American.  The supplemental record would have shown
> that African-Americans were selected for prosecution in federal court for the
> minimum mandatory sentences while whites engaged in the same conduct were
> either referred to state court, or were not charged at all.  The showing of disparate
> treatment was essential to enable trial counsel an adequate opportunity to show

---

[1]  The almost exclusive procedure for raising a claim of ineffective assistance of counsel is by collateral attack under 28 U.S.C. § 2255.  *United States v. Galloway*, 56 F.3d 1235, 1241 (10th Cir. 1995) (en banc).

proof of selective prosecution. . . .

"Memorandum of Law in Support of 28 U.S.C. 2255 Motion," filed April 19, 1995 (dkt. no. 1)

[hereinafter "Bryant Motion"], at 5-6.

*Armstrong* instructs that to establish a discriminatory effect, "the claimant must show that

similarly situated individuals of a different race were not prosecuted." *Armstrong*, 517 U.S. at

465. Mr. Bryant points to specific examples of selectivity on the part of Detective Edward Lucas,

alleging that three other individuals involved in essentially the same transactions as Bryant, but

who were not African-American--O.C. Russell, Robert "Rob" Apodaca, and Denin Richard

Espinosa a/k/a Denny Bridgeforth--were prosecuted by Lucas in state court, where they faced

substantially less punishment.

To establish that his federal prosecution "'was motivated by a discriminatory purpose,'"

petitioner must show "that the government chose to prosecute him in a particular manner merely

because he is an African-American." *United States v. Dukes*, 139 F.3d 469, 474 (5th Cir. 1998)

(citing *United States v. Cooks*, 52 F.3d 101, 105 (5th Cir. 1995)). *See also United States v.*

*Furman*, 31 F.3d 1034, 1037 (10th Cir. 1994) (claimant must show that "the government's

selection of him for prosecution 'was invidious or in bad faith and was based on impermissible

considerations such as . . . the desire to prevent the exercise of constitutional rights,'" (quoting

*United States v. Salazar*, 720 F.2d 1482, 1487 (10th Cir. 1983), *cert. denied*, 469 U.S. 1110

(1985)). As to this element, Mr. Bryant's allegations are sketchier, but again point to Detective

Lucas:

> Lucas selectively chose which defendants to charge with crack cocaine and in what
> court. It is clear that [O.C.] Russell and Rob [  ] were involved in the same sting
> operation. Russell hispanic, Brighforth [sic] and Rob white hispanic all charged in

- 6 -

state court.  The Petitioner is black and charged in federal court.  This is selective prosecution . . . .

Objections at 4.  Mr. Bryant also refers to a "Prosecution Memorandum" discussing the defendants referred for federal prosecution, a memorandum which Bryant suggests that these defendants were singled out because each is black.  "The government use[s] the racial overtone throughout."  *Id.* at 2.

In 1992, the trial court rejected Mr. Bryant's selective prosecution claim on its merits, ruling that "there is nothing presently before this court other than the bald assertions of the defendant . . . that substantiate that there has been a selective prosecution based on race."  Order, filed April 30, 1992, at 3-4, *United States v. Marion Bryant*, Case No. 91-CR-27W (D. Utah) (denying defendant's request for an evidentiary hearing).  On direct appeal, the Tenth Circuit rejected Mr. Bryant's selective prosecution claim, concluding that he had waived the claim because he failed to show cause for failing to raise the claim prior to trial.  *United States v. Bryant*, 5 F.3d 474, 476 (10th Cir. 1993).  Mr. Bryant now alleges ineffective assistance of counsel as the "cause" for that omission,[2] and the magistrate judge concluded that Bryant's ineffective assistance claim may be considered on collateral review.  Report and Recommendation at 8.

As noted above, to prevail on his ineffective assistance claim, Mr. Bryant must show, among other things, that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 694.  Mr. Bryant thus must demonstrate that he probably would have prevailed on his selective prosecution

---

[2]        The Government suggests "that 'cause' as discussed in <u>Bryant</u> under Rule 12(f) Fed.R.Crim.P. and 'cause' required for purposes of asserting particular claims under § 2255 is not the same . . . ."  United States' Response in Opposition to Petitioner's § 2255 Motion," filed May 10, 1995 (dkt. no. 8) ("Gov't Response"), at 9.

claim had it been fully and timely presented to the trial court.

The Government argues that "[t]he record is devoid of any evidence of selective prosecution." Gov't Response at 10. Echoing this view, the Report and Recommendation states that "the defendant [petitioner?] has failed to provide any evidence that his prosecution was impermissibly selective." Report and Recommendation at 10. Mr. Bryant points to the exhibits annexed to his motion papers as his evidence, and argues that the magistrate judge "did not view all the exhibits with a clear and open eye." Objections at 4.

The question now before this court is whether the facts marshaled by Mr. Bryant "support the inference that the Government was singling out blacks for cocaine prosecution." *Armstrong*, 517 U.S. at 460.

## V

The events of June 22, 1990, and their diverse consequences, prove instructive.

### The Transaction

Having purchased crack cocaine from Robert Apodaca and O.C. Russell on previous occasions, "knowing that they were obtaining their product from J.B.," Detective Edward Lucas, a Murray City police detective working with the Metro Narcotics Strike Force, frequented a residence on 1300 South and 200 East in Salt Lake City, "hoping to eventually run into J.B." On June 22, 1990, while attempting to purchase 1/4 ounce of crack cocaine, Lucas met "J.B.," whom he later identified in written reports and trial testimony as Marion Bryant, Jr., the petitioner. In Lucas' own words, as set forth in his handwritten report:

> I approached J.B. + told him who I was[.] He admitted seeing me on several other "crack" deals through various middle men. I told him that his so called middle men were destroying a good business relationship between us. I told him of the high

prices and the light packages. I then told him Robert wanted $600.00 for 1/4 ounce
of crack + he laughed. He agreed to sell me ½ ounce of crack for $700.00. J.B. led
Rob, O.C. + myself to Rob's apartment so that we could weigh out my purchase.
Rob brought a triple beam scale from the bedroom area to the kitchen, placed the
scale on the counter, showed me the balancing adjustment knob + asked me to
check its accuracy. I balanced the scale then weighed a nickel to assure its
accuracy. J.B. then put a pkg. of crack on the scale, it was slightly heavier than 14
gms. plastic and all. I gave him $700.00 for the pkg. A short conversation took
place + J.B. walked me outside. We spoke of better prices with volume +
consistancy of business. J.B. did not want to give me his pager number. He said he
was in the process of re-evaluating his business + did not want to personally do
business w/ anyone unless it was a $500.00 or more pkg. J.B. said after he was sure
I was serious he would give me his pager number, in the meantime I gave him my
pager number + he put the number into the memory of his mobile phone.

Salt Lake City Metro Narcs Report, dated June 22, 1990, Case No. 90-54562. Concerning

participation by others, Lucas continues:

It should be duly noted that all of the suspect parties mentioned in this
report were present during the narcotics transaction w/ Rob, O.C., J.B., myself and
the MMJ standing in the kitchen area. They kept very close watch on me as if they
were J.B.'s protection.

Detective Lucas' testimony at trial concerning the events of June 22 generally conformed to the

content of his handwritten report. *See* Transcript of Trial, dated January 23, 1992, at 22:21, 35:7-

44:3 (testimony of Edward Lucas).

### O.C. Russell/Denin Espinosa

For O.C. Russell and Denin Richard Espinosa a/k/a Bridgeforth, the events of June 22

became the footing for Count III of a criminal information filed on July 11, 1991 in Third Circuit

Court, alleging that:

at 1380 South 200 East, in Salt Lake County, State of Utah, on or about June 22,
1990, in violation of Title 58, Chapter 37, Section 8(1)(a), (x), Utah Code
Annotated 1953, as amended, in that the defendants, O.C. RUSSELL and DENIN
RICHARD ESPINOSA, as parties to the offense, did knowingly and intentionally
distribute, offer, agree, consent or arrange to distribute a controlled or counterfeit

substance, to-wit: Cocaine, a Schedule II Controlled Substance;

Count III included a sentencing enhancement: "further, that the offenses were committed in concert with two or more persons in the commission or furtherance of the offenses, giving rise to enhanced penalties as provided by Section 76-3-203.1, Utah Code Annotated, 1953, as amended[.]"  Detective Lucas' probable cause statement, incorporated into the criminal information, averred:

> Count III:
>
> On June 22, 1990, at approximately 2140 hours at 1380 South 200 East, in Salt Lake County, affiant purchased from the defendants Russell and Espinosa, a substance which has been analyzed by the State Crime Lab and found to be Cocaine, a Schedule Controlled Substance.  The defendants acted in concert with two or more persons in committing the crime of distribution of a controlled substance by having the other individuals stand guard while the transaction took place.

**Marion Bryant, Jr.**

For Marion Bryant, Jr., the events of June 22 served as the footing for Count I of his federal Indictment:

<u>Count I</u>

> On or about the 22nd day of June, 1990, in the Central Division of the District of Utah, at Salt Lake City, Utah,

MARION BRYANT

> defendant herein, did knowingly and intentionally distribute approximately 12.7 grams of a mixture or substance containing a detectable amount of cocaine base, a Schedule II narcotic controlled substance; all in violation of Title 21 U.S.C. § 841(a)(1) and 841(b)(1)(B).

Indictment (dkt. no. 1), *United States of America vs. Marion Bryant*, Case No. 91-CR-27W (D. Utah filed January 23, 1991).

**Robert Apodaca**

It remains unclear from the materials now before this court whether Robert "Rob" Apodaca was ever charged for his participation the June 22, 1990 crack cocaine sale at all.

## VI

Upon pretrial inquiry from Mr. Bryant's trial counsel concerning the other persons mentioned in Detective Lucas' report, counsel for the Government responded in a letter dated December 6, 1991 that O.C. Russell, Robert Apodaca, and Denin Espinosa "have nothing to do with this case.  As far as I know, they have been charged themselves in state court, but I am not certain.  They are not snitches, they are not witnesses, and they are mentioned only because Lucas was dealing with them as well as Bryant."  In a subsequent colloquy with the court at the time of sentencing, counsel for the Government stated:

> I certainly don't mind going on the record saying that the people that were brought to federal court were brought here because of the amounts of controlled substances they distributed and the possibility of those enhanced sentences, and I don't in the slightest hesitate to say also that it has nothing to do with race, nor do I deny that in fact they were all black; but they're not here because they're black. They're here because they distributed amounts of controlled substances that met the minimum mandatories, with one exception. . . .

Transcript of Hearing, dated May 1, 1992, at 8:7-16 (Mr. Lubeck).

Yet if the selection criterion for federal prosecution was drug quantity, Bryant postulates, then O.C. Russell, Denin Espinosa and Robert Apodaca, as participants in the same June 22 transaction,  were accountable for the same quantity as he was, 12.7 grams of crack cocaine.[3] They would also be accountable for the additional quantities of crack cocaine that Lucas reported

---

[3]      Indeed, according to Detective Lucas, Apodaca hosted the sale at his apartment and furnished the scales used to weigh the "package."

- 11 -

he purchased from them on prior occasions. Moreover, Cecil Smith, another African-American, was prosecuted in federal court notwithstanding the fact that his offense conduct concededly did *not* involve quantities sufficient to invoke federal minimum mandatory sentences. *See United States v. Cecil L. Smith*, Case No. 91-CR-24A (D. Utah filed January 23, 1991).

Differences in quantity, standing alone, do not explain the perceived distinctions.

Other neutral criteria might be suggested: were O.C. Russell and Denin Espinosa already facing state criminal charges when the Government decided to present the case against Marion Bryant to the grand jury, triggering a Government policy against dual prosecutions? Apparently not, as the indictment against petitioner was issued January 21, 1991, while the criminal information against Russell and Espinosa was endorsed by the county attorney's office as authorized for presentment and filing on March 7, 1991.

Was it a matter of suspected gang affiliation? Grand jury testimony indicated that Marion Bryant "might be affiliated with the Hoover Cribbs [Crips?], which is a street gang in California." Detective Lucas testified at trial that "[i]t was indicated to me by other suspects he was a member of the crips gang, which is reflected by blue clothing and the people that he associated with." Transcript of Trial, dated January 23, 1992, at 78:8-10 (testimony of Edward Lucas). Yet Lucas' written reports also indicate that Russell, Apodaca and Espinosa (a/k/a Bridgeforth) had each been identified "by the gang squad."

Did Lucas select O.C. Russell, Robert Apodaca, and Denin Espinosa for state prosecution—or did the Government decline federal prosecution—because of some lesser role in the offense, *i.e.*, because they served only as "middlemen" in his transactions with Marion Bryant? This seems doubtful when one recalls that another Lucas "middleman," Chris Harris, was indicted

- 12 -

and convicted on federal charges of aiding and abetting the distribution of 1/8- and 1/4-ounce

quantities of crack cocaine--crack cocaine supplied by Marion Bryant in May of 1990.  *See Harris*,

997 F.2d at 814.

Of course, Chris Harris, like Marion Bryant, is black.

And so is Michael Dawayne Whittington, another "middleman" identified by Lucas as

dealing crack cocaine obtained from Marion Bryant.  Whittington was also indicted by a federal

grand jury on the same day as Bryant.  *See United States v. Michael Whittington*, Case No. 91-CR-

20G (D. Utah filed January 23, 1991).

And so is Harry Jarmar Gordon a/k/a Harry J. Jordan, another Bryant "middleman" referred

to in Lucas' reports by the colorful sobriquet "Hawk," who was indicted by the federal grand jury

on that same day, January 23, 1991.  *See United States of America v. Harry Jarmar Gordon*, Case

No. 91-CR-22S (D. Utah filed January 23, 1991).

From this pattern of differential treatment of persons who played similar roles in the same

transaction or in related transactions, petitioner draws a rational inference of a discriminatory

effect, that is, "that similarly situated individuals of a different race were not prosecuted" in federal

court.  *Armstrong*, 517 U.S. at 465.  Likewise, the fact pattern underlying these prosecutions

supports an inference that at least at some stage in the process, his federal prosecution "'was

motivated by a discriminatory purpose,'" that is, "that the government chose to prosecute him in a

particular manner merely because he is an African-American."  *Dukes*, 139 F.3d at 474.  These are

*not* the only reasonable inferences which may be drawn from the pertinent facts, but they do offer

one rational explanation for the perceived distinctions.

Reasonable inferences, by themselves, may not be enough to establish petitioner's claim of

- 13 -

selective prosecution. The question at this stage, however, is really whether petitioner is entitled to an evidentiary hearing on his claim, and even before that, whether petitioner is entitled to discovery of additional factual material bearing upon discriminatory effect and discriminatory purpose. The Report and Recommendation rejected petitioner's selective prosecution theory, echoing the trial court's earlier denial of an evidentiary hearing on the issue. Report and Recommendation at 10-12, 19 & n.6. It makes no mention of whether petitioner may have been entitled to discovery based upon a timely claim of selective prosecution.

*Armstrong* articulates the threshold requirements for entitlement to discovery of facts bearing upon selective prosecution claims: "a credible showing of different treatment of similarly situated persons." 517 U.S. at 470. This requirement, in the Court's mind, "adequately balances the Government's interest in vigorous prosecution and the defendant's interest in avoiding selective prosecution." *Id.* In *Armstrong*, the Court overturned the lower court's grant of leave to conduct discovery because the defendants' evidence "failed to identify individuals who were not black and could have been prosecuted for the offenses for which respondents were charged, but were not so prosecuted." *Id.*

> In the present case, if the claim of selective prosecution were well founded, it should not have been an insuperable task to prove that persons of other races were being treated differently than respondents. For instance, respondents could have investigated whether similarly situated persons of other races were prosecuted by the State of California and were known to federal law enforcement officers, but were not prosecuted in federal court.

*Id.* Quoting this passage in part, the Report and Recommendation concludes that Bryant's claim "is inadequate under the standard set forth in *Armstrong*." Report and Recommendation at 10-11.

- 14 -

Yet Bryant has identified *three* "similarly situated persons of other races"—O.C. Russell,[4] Denin

Espinosa (a/k/a Bridgeforth) and Robert Apodaca—who ostensibly were prosecuted by state

authorities, who were known to the Government,[5] but who "were not prosecuted in federal court."

Had petitioner's counsel made a timely pretrial motion grounded upon this evidence,[6] it

appears that he would have met the threshold requirements for discovery under *Armstrong*. That

seems to be the question raised by Mr. Bryant's ineffective assistance claim, and it seems to be a

question that the Report and Recommendation does not resolve.

This court does not know and cannot predict what additional information, if any, petitioner

may have been able to obtain through discovery that would buttress his selective prosecution

claim. There may be nothing. There may be something, perhaps even enough to warrant the

evidentiary hearing denied by the trial court and now requested in this proceeding. That remains

to be seen.

This court is not prepared to decide the merits of petitioner's selective prosecution claim, or

to rule upon his pending request for an evidentiary hearing, until the petitioner has been afforded

an opportunity to conduct discovery of facts bearing upon the elements of his claim pursuant to

Rule 6 of the Rules Governing Section 2255 Proceedings for the United States District Courts.

---

[4]     O.C. Russell's racial background appears to be either mixed or ambiguous. Detective Lucas' report identifies him as "Black/Hisp."

[5]     All three individuals are described during the presentation of Marion Bryant's case to the grand jury (*see* Transcript of Proceedings, dated January 23, 1991, at 3:19-4:24), and in connection with the June 22 transaction, Robert Apodaca was referred to in the Government's opening statement at trial. *See* Transcript of Trial, dated January 23, 1992, at 4:6-5:14. The written reports and documents upon which petitioner relies were available to the Government and indeed, were furnished to Bryant's counsel by the Government.

[6]     If as the court of appeals suggests, it was necessary to raise Bryant's claim by pretrial motion in order to avoid waiver, then by failing to apprise himself of the threshold facts and file such a motion, trial counsel's assistance was in this narrow instance, ineffective.

As a practical matter, it also makes sense that petitioner be afforded the assistance of counsel in conducting discovery on his claim, and the court finds that appointment of counsel pursuant to Rule 6 and 18 U.S.C. § 3006A(g) is necessary for the effective utilization of discovery procedures.

This court recognizes that as to his selective prosecution claim, Mr. Bryant does not meet the Government on a level playing field. His remains an uphill battle from the outset. As *Armstrong* explains,

> A selective-prosecution claim asks a court to exercise judicial power over a "special province" of the Executive. *Heckler v. Chaney*, 470 U.S. 821, 832 (1985). The Attorney General and United States Attorneys retain " 'broad discretion' " to enforce the Nation's criminal laws. *Wayte v. United States*, 470 U.S. 598, 607 (1985) (quoting *United States v. Goodwin*, 457 U.S. 368, 380, n. 11 (1982)). They have this latitude because they are designated by statute as the President's delegates to help him discharge his constitutional responsibility to "take Care that the Laws be faithfully executed." U.S. Const., Art. II, § 3; see 28 U.S.C. §§ 516, 547. As a result, "[t]he presumption of regularity supports" their prosecutorial decisions and "in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties." *United States v. Chemical Foundation, Inc.*, 272 U.S. 1, 14-15 (1926). In the ordinary case, "so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion." *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978).

517 U.S. at 464.

The Government thus enjoys the benefit of a presumption that its prosecutorial decisions are proper. "In order to dispel the presumption that a prosecutor has not violated equal protection, a criminal defendant must present 'clear evidence to the contrary.'" *Id.* at 465 (quoting *Chemical Foundation*, 272 U.S. at 14-15).[7] The expressed reasons for this presumption find root in

---

[7]    This presumption appears to have a powerful effect. "That at least some officials have engaged in racially selective prosecutions is beyond doubt. Research has uncovered no cases, however, in which a court has ruled that, on grounds of racial discrimination, a prosecutor abused his discretion." Randall Kennedy, *Race, Crime, and the Law* 354 (1997) (footnote omitted).

constitutional separation of powers principles:

> We explained in *Wayte* why courts are "properly hesitant to examine the decision
> whether to prosecute." 470 U.S., at 608.  Judicial deference to the decisions of
> these executive officers rests in part on an assessment of the relative competence of
> prosecutors and courts.  "Such factors as the strength of the case, the prosecution's
> general deterrence value, the Government's enforcement priorities, and the case's
> relationship to the Government's overall enforcement plan are not readily
> susceptible to the kind of analysis the courts are competent to undertake." *Id.*, at
> 607.  It also stems from a concern not to unnecessarily impair the performance of a
> core executive constitutional function.  "Examining the basis of a prosecution
> delays the criminal proceeding, threatens to chill law enforcement by subjecting the
> prosecutor's motives and decisionmaking to outside inquiry, and may undermine
> prosecutorial effectiveness by revealing the Government's enforcement policy."
> *Ibid.*

*Id.*  Mr. Bryant's selective prosecution claim invokes this court's power in order "to challenge an

exercise of one of the core powers of the Executive Branch of the Federal Government, the power

to prosecute."  *Id.* at 467.

Yet because of the actions of yet another branch of the Federal Government—the

Congress—the exercise of this core power of the Executive Branch has become entangled with

what historically has been understood to be a *judicial* function: the imposition of sentence upon an

individual defendant in a criminal case.  This entanglement may well have operated to furnish the

grounds for Mr. Bryant's selective prosecution claim in this case.  This entanglement may also

warrant closer scrutiny of the charging decision that otherwise would be the case.

### VII

Though the United States Constitution expressly forbids the legislative imposition of

criminal punishments (Article I, § 8, ¶ 3), Congress may define what conduct constitutes a

criminal offense, and may define the punishment to be meted out to persons found guilty of that

offense in a judicial proceeding.  *Mistretta v. United States*, 488 U.S. 361, 364 (1989); *Gore v.*

- 17 -

*United States*, 357 U.S. 386, 393 (1958) (matters such as "the proper apportionment . . . are peculiarly questions of legislative policy"); *United States v. Wiltberger*, 18 U.S. (5 Wheat.) 76 (1820). Yet Congress "early abandoned fixed-sentence rigidity . . . and put in place a system of ranges within which the sentencer could choose the precise punishment," *Mistretta*, 488 U.S. at 364, and consequently, "the concept of individualized sentencing in criminal cases generally, although not constitutionally required, has long been accepted in this country." *Lockett v. Ohio*, 438 U.S. 586, 602 (1978) (Burger, C.J., joined by Stewart, Powell, and Stevens, JJ.).

In recent years, Congress has increasingly chosen to predetermine the particular sentence to be imposed in particular cases in two ways: (1) through a system of mandatory sentencing guidelines crafted by the United States Sentencing Commission;[8] and (2) through mandatory minimum sentences enacted as part of various federal criminal statutes. Supposedly this approach to sentencing promises greater uniformity and even-handedness in sentencing by drastically limiting the discretion of the sentencing court to determine the sentence and by eliminating the federal parole system. *See generally Mistretta*, 488 U.S. at 367-68; *United States v. Hawkins*, 901 F.2d 863, 865 (10th Cir. 1990) ("By enacting the Sentencing Reform Act, Congress decided federal judges shall have only limited discretion in the sentencing process . . . .").[9]

Under the current sentencing scheme, the decision to prosecute in the federal system

---

[8]     The work product of the Sentencing Commission may fairly be termed "guidelines" only to the extent that sentencing judges may depart from them. *See Mistretta*, 488 U.S. at 367 (the Sentencing Reform Act "makes the Sentencing Commission's guidelines binding on the courts, although it preserves for the judge the discretion to depart from the guideline applicable to a particular case if the judge finds and aggravating or mitigating factor present that the Commission did not adequately consider when formulating guidelines."). *See also United States v. Davern*, 970 F.2d 1490, 1500-1505 & n. 11 (6th Cir. 1992) (Merritt, C.J., dissenting), and authorities cited therein.

[9]     Some have chosen to euphemize about this process. *See, e.g., United States v. Seacott*, 15 F.3d 1380, 1392 (7th Cir. 1994) (Easterbrook, J., concurring) ("The Sentencing Reform Act creates only the power [in the Sentencing Commission] to guide judicial discretion within statutory limits.").

(assuming sufficient proof of guilt), to a great extent decides the punishment to be imposed. As the Tenth Circuit has observed, "[t]hough charging decisions implicate executive power, they also implicate the sentencing discretion of district courts." *United States v. Robertson*, 45 F.3d 1423, 1438 (10th Cir. 1995). That court earlier recognized that charging decisions "restrict the district court's ability to impose what it considered an appropriate sentence," *United States v. Carrigan*, 778 F.2d 1454, 1464 (10th Cir. 1985), a truth borne out all the more by the current sentencing scheme. *See, e.g.,* Daniel J. Freed, *Federal Sentencing in the Wake of Guidelines: Unacceptable Limits on the Discretion of Sentences*, 101 Yale L.J. 1681, 1723-24 & nn. 215-220 (1992). Through its "sentencing reform," Congress did not eliminate discretion in criminal sentencing. It merely shifted that discretion to itself or its delegate,[10] and to the Executive Branch.[11] Prosecutorial discretion as a practical matter becomes sentencing discretion. In most cases, charge effectively determines punishment.

By predetermining punishment based upon the charging decision, Congress may have created an incentive for selective prosecution that otherwise would not have existed.

In this case, the Government acknowledged that local authorities referred petitioner and others for federal prosecution precisely because of the harsher mandatory minimum penalties available under federal law: "They're here because they distributed amounts of controlled substances that met the minimum mandatories, with one exception . . . ." Absent mandatory

---

[10]     *Mistretta* acknowledged that the Sentencing Reform Act "consolidate[d] the power that had been exercised by the sentencing judge and the Parole Commission to decide what punishment an offender should suffer," ostensibly vesting that consolidated power in the United States Sentencing Commission. 488 U.S. at 367.

[11]     At least one federal district court has found an abuse of that discretion in cases prosecuted in federal court. *See United States v. Redondo-Lemos*, 817 F.Supp. 812, 818 (D. Ariz. 1993) (finding that female drug couriers treated more leniently by U.S. Attorney's Office in plea bargaining than male drug couriers, resulting in lighter sentences), *reversed,* 27 F.3d 439 (9th Cir. 1994) (lack of evidence of discriminatory intent).

minimum penalties, where would petitioner and others likely have been charged?

In this case, if petitioner is correct, Congress has effectively vested federal sentencing discretion in a single law enforcement officer employed by a municipality, an officer who may have abused that discretion by singling out persons for harsher punishment because they are African-American and referring those persons for prosecution by the Government. If that is so, Congress has effectively vested federal sentencing discretion in an officer who is neither supervised by nor directly accountable to either the United States Department of Justice or the court—an officer who nevertheless may have induced the Government to act in a manner contrary to the Constitution itself.

In this case, if petitioner is correct, Congress, in its ill-conceived effort to wrest sentencing discretion away from judges, may have given thoughtless blessing to invidious discrimination based on race.

Where a judge exercises discretion, there is review by the court of appeals. Under the current scheme, only the prosecutor may temper the punishment in every case that may be presented, accomplishing that through exercise of prosecutorial discretion to determine the charge. The prosecutor's actions, the prosecutor's in-house choices, are not subject to public scrutiny. The concentration of the charging and punishment decisions in the Executive Branch, combined with congressional pre-judgment as to the harshness of outcome, diminishes both the balance and the oversight envisioned in the Constitution,[12] and the value derived from proceedings conducted in

---

[12]     Hamilton urges "that 'there is no liberty, if the power of judging be not separated from the legislative and executive powers.'" *The Federalist No. 78*, at 523 (Alexander Hamilton) (Jacob Cooke ed. 1961) (quoting 1 Montesquieu, *The Spirit of Laws* 181).

the courtroom in broad daylight.[13]  The increased opportunity for abuse must be balanced by some

opportunity for impartial scrutiny.

In this case, the petitioner through discovery may shed sufficient light on the actions of that

officer and on the charging decision to enable the court to discern whether in this case "the

administration of a criminal law is 'directed so exclusively against a particular class of persons . . .

with a mind so unequal and oppressive' that the system of prosecution amounts to 'a practical

denial' of equal protection of the law." *Armstrong*, 517 U.S. at 464-65 (quoting *Yick Wo v.*

*Hopkins*, 118 U.S. 356, 373 (1886)).  The determination whether petitioner may overcome the

presumption of regularity through "clear evidence to the contrary" awaits the completion of that

further inquiry into the facts.

## VIII

> When the government's conduct during an investigation is sufficiently outrageous,
> the courts will not allow the government to prosecute offenses developed through
> that conduct," *United States v. Mosley*, 965 F.2d 906, 908 (10th Cir. 1992), because
> prosecution in such a case would offend the Due Process Clause of the Fifth
> Amendment.  *Id.*  The outrageous conduct defense, however, is an extraordinary
> defense that will only be applied in the most egregious circumstances.  *Id.* at 910.
> In order to prevail, the defendant must show that the challenged conduct violates
> notions of "fundamental fairness" and is "shocking to the universal sense of
> justice." *United States v. Harris*, 997 F.2d 812, 816 (10th Cir. 1993) (citations
> omitted).  In determining whether the government's conduct is outrageous, we look
> to the totality of the circumstances.  *Mosley*, 965 F.2d at 910.

*United States v. Pedraza*, 27 F.3d 1515, 1521 (10th Cir. 1994) (footnotes omitted).

---

[13]     A special report to Congress from the United States Sentencing Commission in 1991 disclosed
continuing sentencing disparities based on factors such as race, gender, circuit, and prosecutorial practices, including
findings that female defendants were less likely to be sentenced at or above the mandatory minimum level than male
defendants and that prison terms required by mandatory minimum sentences often outweigh the severity of the offenses
and the culpability of the offenders.  The Commission concluded that the honesty and truth in sentencing intended by the
guidelines system is compromised since the charging and plea negotiations processes are neither open to public review
nor generally reviewable by the courts.  United States Sentencing Commission, *Special Report to the Congress:*
*Mandatory Minimum Penalties in the Federal Criminal Justice System* (August 1991).

Mr. Bryant asserts that the Government, through the actions of Detective Edward Lucas, engaged in outrageous conduct.  He cites to an opinion of this court in *United States v. Harris*, Case No. 91-CR-0023J (D. Utah, decided Dec. 6, 1991), as evidencing "an overwhelming pattern of outrageous conduct where detective Lucas is concerned."  Objections at 1.  In *Harris*, this court dismissed two of three drug trafficking counts based upon a finding that the undercover agent's agreement to compensate the defendant with crack cocaine in exchange for Harris' help as a middleman in facilitating drug purchases amounted to outrageous conduct, particularly where the agent's safety was not at risk at the time he made the questionable agreements.[14]  In the court's mind, it did not appear that Congress had made any exception to the drug trafficking statutes allowing for distribution of controlled substances by government agents, and that the undercover agent had no business paying people with crack cocaine, at least where his safety was not at risk.

In *United States v. Harris*, 997 F.2d 812 (10th Cir. 1993), however, the court of appeals vacated this court's determination concerning outrageous conduct, concluding that distribution of crack cocaine by a detective Lucas as payment for Harris' assistance in arranging transactions with "Defendant's dealer, Marion Bryant," did not offend due process or amount to conduct "'shocking to the universal sense of justice,'" at least absent proof that Lucas had exploited Harris' addiction as a means of coercing Harris' participation in crime.  997 F.2d at 815 (quoting *United States v. Russell*, 411 U.S. 423, 432 (1973)).

Apart from Mr. Bryant's assertions concerning selective prosecution, it remains unclear what specific conduct on the part of Detective Lucas or the Government petitioner deems to be

---

[14]       The court also found that the agent did *not* engage in outrageous conduct in circumstances where he allowed Harris to take a portion of the crack cocaine which was the subject of a purchase in order to avoid putting his own personal safety at risk.

- 22 -

outrageous in light of *Harris*. Mr. Bryant sets forth no claim that Lucas created the entire crime,[15] or coerced Bryant into participating in the crime,[16] or exploited an addiction on the part of Bryant for the purpose of stacking charges.[17]   Rather, Mr. Bryant claims:

> The Government['']s conduct in this case is clearly improper.  Officer Lucas, was allowed to decide apparently without supervision to negotiate with Movant and 150 others for an ounce, a pound, a kilo, 100 kilos, a million kilos whatever he wants to cr⁚m of a substance, and, of course, if the defendant or Movant and others in this case bite the bait, then that amount chosen by the Drug Agen[t] Officer Lucas in this case determined whether the accused would be tried and sentenced in State or Federal Court and what the drug sentence would be.  <u>U.S. v. Staufer</u>, 38

---

[15]    Mr. Bryant asserts that he "has shown that the government agent instigated the alleged crimes in order to prosecute someone for their commission," establishing outrageous conduct.  Bryant Motion at 18.  However, under *Harris*, outrageous conduct must involve more than offering to buy what someone is willing to sell.  Petitioner must show that the Government "'engineer[ed] and direct[ed] the criminal enterprise from start to finish.'"  *Harris*, 997 F.2d at 816 (quoting *Mosely*, 965 F.2d at 911 (quoting *United States v. Ramirez*, 710 F.2d 535, 539 (10th Cir. 1983))).  As an example, *Harris* points to *United States v. Twigg*, 588 F.2d 373 (3d Cir. 1978), in which the setup and operation of a methamphetamine lab "was engineered and directed entirely by the government and the defendants contributed nothing more than their presence and enthusiasm."  *Harris*, 997 F.2d at 816.  *Harris* contrasted *Twigg* with the instant situation:

> Although the government may hav⁚ initiated the transaction, it was Defendant [Harris] who arranged and directed it.  Defendant called his source, Marion Bryant, who was unknown at the time to Detective Lucas, and acted as an intermediary in transporting the cocaine and the money between the two. Defendant oversaw the execution of each transaction.  Thus *the government's role in instigating the transaction and acting as a buyer does not amount to creating the crime*. . . .

*Id.* (emphasis added).  Under *Harris*, "instigating" a drug transaction is not outrageous conduct.

[16]    While Mr. Bryant has made passing reference to an entrapment defense not advanced at trial, the specifics of such a defense remain unclear.  Under Tenth Circuit law, petitioner cannot rely on outrageous conduct to circumvent a showing of predisposition in response to an entrapment defense:

> We note that the defense of outrageous conduct differs from the defense of entrapment and may be available where the entrapment defense is not, due to the defendant's predisposition to commit the crime for which he was prosecuted.  *Id.* at 908-09.  In contrast to the entrapment defense, which looks to the defendant's state of mind, the outrageous conduct defense looks to the government's behavior. *Id.*  The outrageous conduct defense, however, is not intended to serve as "a device to circumvent the predisposition test in the entrapment defense."  *Id.* at 910;  see also *United States v. Warren*, 747 F.2d 1339, 1341-42 (10th Cir. 1984) (outrageous conduct defense reserved for "only the most intolerable government conduct").

*Pedraza*, 27 F.3d at 1521 n.4.

[17]    *Harris* recognized that "[w]here the evidence shows . . .that law enforcement personnel rely on a known addiction to carry out multiple transactions with the primary purpose of stacking charges, the government has engaged in outrageous conduct violative of the defendant's due process rights."  *Harris*, 997 F.2d at 818.

F.3d 1103 (9th Cir. 1994). Officer Lucas['] actions clearly amounted to entrapment. U.S. v. Abcasis, 45 F.3d 39 (2nd Cir. 1995).

Bryant Motion at 15.

The Report and Recommendation likens Bryant's claim to one of "sentencing entrapment," that is, "the notion that the government manipulated the sentencing process by forcing the defendant to purchase greater quantities than desired," *United States v. Bara*, 13 F.3d 1418, 1420 (10th Cir. 1994), which the Report and Recommendation concludes is unsupported by this record. Report and Recommendation at 13. This court agrees. In this case, Bryant, not Lucas, supplied the approximately 38 grams of cocaine base involved in Bryant's offenses of conviction. None of the facts recited by Mr. Bryant in his motion reflect coercion by Detective Lucas in trying to obtain a larger amount.[18]

Petitioner has not shown outrageous conduct of the kind discussed in *Harris*. Rather than relying on *Harris* to support a claim that Detective Lucas paid petitioner in crack cocaine, or that he coerced petitioner to sell crack through manipulation of an addiction, petitioner relies on *Harris* for the more generalized notion that Detective Lucas engaged in "an overwhelming pattern of outrageous conduct." Objections at 1. More than anything else, petitioner's claims of outrageous conduct seem to be an attempt to impugn the character and motives of Detective Lucas, somehow leading to an inference that his referral of Marion Bryant, Jr. for federal prosecution was motivated by racial animus or some other improper purpose. However, the fact that Detective Lucas has done other things of which this court did not approve does not establish that he has done what

---

[18]   It appears that Lucas obtained similar quantities of crack cocaine from Bryant during the same time period in the transactions that became the subject of the *Harris* prosecution. *See Harris*, 997 F.2d at 814.

petitioner now alleges, or that he acted with the improper motive petitioner now suggests.

Mr. Bryant cannot satisfy the requirements of *Armstrong* simply by arguing that *Harris* found that Detective Lucas was a bad guy.

## IX

Mr. Bryant challenges the sentencing court's application of a four-level upward adjustment for Bryant's role in the offense under § 3B1.1(a) of the federal sentencing guidelines. Rather than concentrating on the legal reasons why petitioner may not be entitled to review of this claim,[19] the court chooses to deal with the claim squarely on its merits.

Mr. Bryant's Presentence Report recounted that

> [b]ased on the investigative reports filed in this case, it is apparent that the defendant's involvement in this distribution scheme is extensive enough to qualify him as an organizer or leader of the criminal activity. A minimum of six individuals have been identified in police reports as having completed drug transactions with an undercover officers after receiving the drugs from the defendant. . . .

Presentence Report at 5. Mr. Bryant argues that "[t]here was never at any time six (6) individuals to testify against the Petitioner that he was an organizer and or leading others into criminal activity." Objections at 7. Moreover, "Petitioner had no co-defendants and was not charged with conspiracy." Mr. Bryant also wishes to bind the Government to its informal assertion that at least three individuals mentioned in the reports "have nothing to do with this case." *Id.*

---

[19] The Government correctly states the rule of *Frady* and the law of this circuit. *United States v. Frady*, 456 U.S. 152, 167-68 (1982) (petitioner must demonstrate "'cause' excusing his double procedural default, and . . . 'actual prejudice' resulting from the errors of which he complains," or that a "fundamental miscarriage of justice" will occur if the claim is not heard); *United States v. Warner*, 23 F.3d 287, 291 (10th Cir. 1994); *United States v. Cook*, 997 F.2d 1312, 1320 (10th Cir. 1993); *Hines v. United States*, 971 F.2d 506, 507 (10th Cir. 1992); *see also United States v. Hall*, 843 F.2d 408, 409-10 (10th Cir. 1988). Otherwise, "section 2255 is not available to test the legality of matters which should have been raised on appeal." *United States v. Cox*, 567 F.2d 930, 932 (10th Cir. 1977), *cert. denied*, 435 U.S. 927 (1978). To determine "actual prejudice," however, the court nevertheless must take the merits of petitioner's claim into account; a petitioner suffers no prejudice if a meritless claim is not heard.

In determining whether a defendant was an organizer, the sentencing court should consider whether the defendant exercised decisionmaking authority, the extent of the defendant's participation in the offense, his role in recruiting accomplices, his role in planning or organizing the offense, and the degree of control or authority the defendant exercised over other co-conspirators. U.S.S.G. § 3B1.1 comment. (n.4). *See United States v. Torres*, 53 F.3d 1129, 1142 (10th Cir. 1995), *cert. denied*, 515 U.S. 1152 and 516 U.S. 883 (1995). "[T]he gravamen of this enhancement is control, organization, and responsibility for the actions of other individuals, because § 3B1.1(a) is an enhancement for organizers or leaders, not for important or essential figures." *Id.* (citations and internal quotation marks omitted).

The mere fact a defendant supplied cocaine to others, without something more, is not enough to support a finding he was an organizer or leader under § 3B1.1(a). *See United States v. Owens*, 70 F.3d 1118, 1129 (10th Cir. 1995). To satisfy § 3B1.1(a), the Government must show that a defendant's "relationship with the other participants amounted to something more than a wholesaler/retailer or buyer/seller relationship." *Torres*, 53 F.3d at 1143. Thus, to say that other persons "completed drug transactions . . . after receiving the drugs from the defendant" by itself is not enough.[20]

Instead, it appears that Mr. Bryant's claim turns on Bryant's exercise of control and authority over his "middlemen" and the transactions in which they engaged. A defendant may be shown to be a leader or organizer of the offense where he was trafficking in cocaine through middlemen. *See United States v. McIntyre*, 997 F.2d 687, (10th Cir. 1993) (§ 3B1.1 adjustment

---

[20]   The Government's assertion to the contrary, (*see* Gov't Response at 11), parroted by the Report and Recommendation, (*see* Report and Recommendation at 16-17), is erroneous.

applies to defendant who "accepted the proceeds of sales through middlemen"), *cert. denied*, 510 U.S. 1063 (1994).

As outlined above, there were at least six middlemen identified during the investigation: O.C. Russell, Robert "Rob" Apodaca, Denin Espinosa (a/k/a Bridgeforth), Michael Whittington, Harry "Hawk" Gordon (a/k/a Jordon), and Chris Harris.[21]  The evidence before the sentencing court showed that Bryant exercised control over others by giving instructions and directions to his middlemen in carrying out particular transactions and that he exercised overall leadership of the distribution operation, which he reportedly referred to as "his business."  *See United States v. Hardwell*, 80 F.3d 1471, 1496 (10th Cir. 1996), *rev'd and remanded on other grounds*, 88 F.3d 897 (10th Cir. 1996).  Bryant directed his middlemen to carry out various drug transactions for him, and they in turn followed his directions.  Bryant himself exercised control over the quantity and timing of the sales, as well as the price to be paid for the drugs and the actual handling of crack cocaine, as was evident in the June 22 transaction detailed above.[22]  Applying the criteria set forth in the guidelines to these facts, it appears that the sentencing court did not clearly err in finding by a preponderance of the evidence that Bryant was an "organizer or leader" for purposes of § 3B1.1(a).  *See United States v. Lacey*, 86 F.3d 956, 967 (10th Cir. 1996), *cert. denied*, 117 S.Ct. 331 (1996).

--------

[21]     Furthermore, in determining whether there were five or more participants for purposes of the guidelines, the defendant is included.  *See Robertson*, 45 F.3d at 1448.

[22]     Count II of Bryant's Indictment involved a June 28, 1990 transaction in which Detective Lucas testified that he contacted Bryant through a middleman, who then met with Lucas in a grocery store parking lot.  Bryant set a $750 price for ½ ounce of crack cocaine, to which Lucas agreed, whereupon Bryant told Lucas, "If you want to do business, do it with Hawk," a Bryant middleman.  Lucas paid Hawk $760 in cash. Bryant then handed the contraband to Hawk, who then handed it to Lucas enfolded in a $20 bill because Bryant did not have $10 change.  Bryant again advised Lucas that if he "wanted to do business, contact Hawk and he would make the appropriate arrangements."  Transcript of Trial, dated January 23, 1992, at 49:10-54:22 (testimony of Edward Lucas).

Even if trial counsel had raised timely objections to the § 3B1.1 adjustment,[23] and raised the question on direct appeal, it appears that the outcome would nevertheless have been the same. In the context of the present § 2255 motion, "counsel's failure to advance a meritless argument cannot constitute ineffective assistance of counsel," *Rodriguez v. United States*, 17 F.3d 225, 226 (8th Cir. 1994), and cannot serve as a basis for collateral relief.

## X

Petitioner Bryant asserts that trial counsel was ineffective in other respects: trial counsel "overlooked essential defenses," including "entrapment, governmental misconduct, [and] the possible use of perjured testimony by the prosecution as could be attributed to inconsistent testimony." Bryant Motion at 6. He also asserts that trial counsel

> failed to properly prepare for trial. Failed to discuss with movant what defenses were available to him. Failed to make appropriate investigations of both a factual and legal nature. Failed to make appropriate objections during trial. Failed to adequately cross-examine key witnesses. Failed to entertain defenses which may have been successful, in particular an entrapment defense. Mr. Booker failed to make appropriate pretrial motions.

*Id.* at 9.

The court has reviewed the copies of the trial transcript furnished by the Government and discerns no obvious deficiencies in the performance of Bryant's counsel during trial. Participants in the crack cocaine transactions testified to the transactional events and identified Mr. Bryant as the person with whom they dealt, and Bryant's counsel doggedly challenged the inconsistencies in the witness' testimony, and attacked the probative value of "pictures of an empty park" and of

---

[23] A timely objection to the facts recited in the Presentence Report also would have been to no avail as they appear to be accurate. Bryant cannot now assert that his six middlemen "have nothing to do with this case" any more than the Government could with reference to the selective prosecution claim. The middlemen comprise part of the factual context of this case for all purposes.

testimony about exotic vehicles never tied to Bryant by ordinary title or registration documents. There appears to be little more that counsel could have done that may have affected the outcome of the trial.

Other than entrapment and governmental misconduct, Mr. Bryant's sweeping allegations of ineffectiveness shed no light on the particular defenses that were available but were not raised, the particular objections that were not made, the exculpatory facts that counsel could have uncovered through additional factual investigation but did not, or the particular questions that counsel should have asked on cross-examination. This court cannot supply these particulars for the petitioner, at least where they are not obvious on the face of the trial record. *See United States v. Fisher*, 38 F.3d 1144, 1147 (10th Cir. 1994) (ineffective assistance claim rejected; "Although we must liberally construe Defendant's pro se petition, . . . we are not required to fashion Defendant's arguments for him where his allegations are merely conclusory in nature and without supporting factual averments." (citations omitted)).

While Mr. Bryant uses the term "entrapment," he points to no particular facts evidencing that he had no previous intent or disposition or willingness to commit the crime charged and was induced or persuaded by a government agent to commit the offense. Indeed, from the trial transcript, it appears that the Government would have little difficulty showing that petitioner had a previous disposition or willingness to traffick in crack cocaine and that the Government's agents merely provided the opportunity to commit the offense. *See United States v. Duran*, 133 F.3d 1324, 1330 (10th Cir. 1998).

Bryant also asserts that while counsel requested copies of "the grand jury transcripts" by letter on December 5, 1991, "[c]ounsel fail[ed] to file a motion compelling the Government to

produce" those transcripts, and the transcripts were not produced by the Government until "the morning of trial, Jan. 22, 1992." Objections at 5. Petitioner's assertion assumes an entitlement to pretrial disclosure of transcripts of grand jury proceedings. No such blanket entitlement exists.

Disclosure of transcripts of grand jury proceedings is governed by statute and rule. Generally, a defendant may obtain transcripts of his own grand jury testimony, *see* Fed. R. Crim. P. 16(a)(1)(A), the relevant testimony of Government witnesses *after* they have testified at trial, *see* Jencks Act, 18 U.S.C. § 3500, and after making a proper showing, grand jury transcripts needed to support a motion to dismiss the indictment, *see* Fed. R. Crim. P. 6(e)(3)(C)(ii).

Here, Bryant did not testify before the grand jury. As Bryant asserts, the grand jury testimony of the Government's witnesses was furnished *before* they testified at trial—certainly more than trial counsel could have compelled by motion under the Jencks Act. Bryant has not suggested what showing trial counsel could or should have made to obtain grand jury transcripts under Fed. R. Crim. P. 6(e)(3)(C)(ii) prior to that time. *See United States v. Anderson*, 915 F. Supp. 1146, 1157 (D. Kan. 1996) (defendants must offer evidence of substantial likelihood of gross or prejudicial irregularities in the conduct of the grand jury), *affirmed*, 114 F.3d 1059 (10th Cir. 1997). It appears that only Government witnesses testified before the grand jury in this case, and that the complete transcript of that testimony was produced to Bryant's counsel prior to trial.

Bryant has not shown an error by his counsel concerning the grand jury transcripts that likely had any effect on the outcome of his trial.

## XI

Finally, Mr. Bryant contends that the trial judge was unknowingly biased against him, resulting in erroneous rulings on Bryant's selective prosecution claim. Yet the fact that the trial

judge denied Bryant an evidentiary hearing on his selective prosecution theory does not demonstrate bias, particularly in light of the stringent threshold showing that must be made under *Armstrong* to obtain such a hearing.   Adverse rulings alone do not establish judicial bias. *Christensen v. McGovern*, 916 F.2d 1462, 1466 (10th Cir.), *cert. denied*, 498 U.S. 999 (1990); *cf. Bradshaw v. Story*, 86 F.3d 164, 166 (10th Cir. 1996) (affirming dismissal of § 2241 petition, where petitioner argued that § 2255 was an inadequate remedy, citing sentencing court's denial of his previous § 2255 petitions as evidence of bias).

Generally, to sustain an allegation of bias by the trial judge as a ground for habeas relief, a petitioner must "factually demonstrate that during the trial the judge assumed an attitude which went further than an expression of his personal opinion and impressed the jury as more than an impartial observer." *Brinlee v. Crisp*, 608 F.2d 839, 852-53 (10th Cir. 1979).   Here, Mr. Bryant does not even suggest that the trial judge exhibited any partiality or bias in front of the jury.

Like petitioner's outrageous government conduct claim, his "unknowing bias" claim appears to have been advanced primarily to bolster his selective prosecution claim, rather than as a basis for § 2255 relief standing by itself.   In either event, however, his claim of bias proves to be insufficient as a matter of law.

For the reasons explained above,

**IT IS ORDERED** that as to petitioner's selective prosecution claim, the petitioner is GRANTED leave to conduct discovery pertaining to that claim, and to have counsel appointed pursuant to Rule 6 of the Rules Governing Section 2255 Proceedings and 18 U.S.C. § 3006A(g) to assist him in the discovery and presentation of that claim; as to the balance of petitioner's claims, his motion for relief pursuant to 28 U.S.C. § 2255 is DENIED.

- 31 -

**IT IS FURTHER ORDERED** that the matter is REMANDED to the United States Magistrate Judge pursuant to 28 U.S.C. § 636(b) for further proceedings concerning petitioner's selective prosecution claim consistent with the foregoing opinion.

DATED this _15ᵗʰ_ day of July, 1998.

BY THE COURT:

Bruce S. Jenkins
United States Senior District Judge

- 32 -

pcn

United States District Court
for the
District of Utah
July 20, 1998


* * MAILING CERTIFICATE OF CLERK * *


Re:  2:95-cv-00362


True and correct copies of the attached were mailed by the clerk to the following:


Mr. Bruce C Lubeck, Esq.
US ATTORNEYS OFFICE - UTAH
,
PFAX 9,5245985

Marion Bryant
USP MARION
#03567081
ROUTE 5
PO BOX 2000
MARION, IL   62959